UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TAKAOKAYA USA, INC.,** : | **Court No. 24-00213** |
| Plaintiff : | |
| v. : | |
| **THE UNITED STATES** : | |
| Defendant. : | |

Plaintiff, Takaokaya USA, Inc. ("Plaintiff" or "Takaokaya USA") by and through its counsel, for its complaint herein alleges as follows:

JURISDICTION AND STANDING

1. This is a civil action contesting the denial by United States Customs and Border Protection ("Customs") of a protest, No. 270424170114 dated May 29, 2024 (the "Protest") regarding the reclassification of raw, dried Nori seaweed imported from Japan by Plaintiff from 1212.21.00 of the U.S. Harmonized Tariff Schedule ("HTSUS") to 2008.99.9190, HTSUS for the first time in 37 years.

2. This Court possesses exclusive jurisdiction over this action by reason of 28 U.S.C. § 1581(a) and § 2631(a).

3. Takaokaya USA is the importer of record of the merchandise whose classification is at issue in this action and the party whose protest against the classification of such merchandise at liquidation was denied by Customs. Takaokaya USA, therefore, has standing under 28 U.S.C. § 2631(a).

4. The underlying Protest covered by this action was timely filed with Customs at the port of entry and was denied on June 5, 2024, thereby making this action timely filed.

5. All liquidated duties and charges were paid prior to the commencement of this action.

FACTUAL BACKGROUND REGARDING THE SUBJECT MERCHANDISE

6. The merchandise whose classification is the subject of this action consists of raw, dried Nori seaweed from Japan (the "Subject Merchandise"). The Subject Merchandise is raw, dried seaweed that has been processed only to remove excess moisture and extend shelf life. However, this alone does not make Nori Seaweed suitable for human consumption. The drying processes to reduce the moisture content only affects how long the seaweed can be stored before roasting and does not prepare the seaweed to be suitable for human consumption. It is a roasting process that is necessary to make the seaweed edible.

7. Takaokaya USA is a company located in Vernon, California and has been in operation for over 37 years. Takaokaya USA imports raw, dried seaweed from its parent company in Japan, Takaokaya Co., Ltd. (the "Japan Parent Company"), which has produced Nori seaweed, a staple of Japanese cuisine, since 1890.

8. The Japan Parent Company, directly or indirectly, harvests and produces the subject dried seaweed for import by Takaokaya USA (and other subsidiary roasters around the world located in consumer markets). Takaokaya USA then takes that raw seaweed and processes it in its Vernon factory to be suitable for human consumption by roasting it, and then cutting and packaging it for distribution to high-quality sushi restaurants across the U.S.

9. None of the Subject Merchandise enters the broader market in the U.S.A. until after Takokaya USA roasts and further processes the seaweed at its factory.

10. All but one of Takaokaya USA's competitors, meanwhile, do not maintain local roasting facilities and instead typically roast their seaweed products abroad and export them

directly to U.S. customers. These imported roasted seaweed products are never as fresh as Takaokaya's and are therefore inferior. As a result, Takaokaya USA product stands out in the market as the freshest and most flavorful.

    11.    As indicated in the flowchart attached as **Exhibit "A"**, the production of the subject seaweed in Japan can be summarized as follows:

(1) first, the seaweed is bred and seeded in a nursery, then cultivated and grown on the ocean surface; then

(2) the seaweed is minimally processed to remove foreign bodies by rinsing it with seawater and mincing it, then rinsing it again with fresh water; then

(3) the seaweed is strained and cut into paper form; then

(4) the seaweed is processed in an automated machine where it is sponge-pressed and hung in a 50-degree Celsius drying room for 90 minutes; then

(5) the seaweed is folded and placed vertically in an electric cabinet-style air dryer for an additional 3 hours at approximately 70-degrees Celsius; finally

(6) the seaweed is wrapped and packaged for shipment to destinations worldwide to be roasted in local roasting factories, such as Takaokaya USA's.

To emphasize, the processing described above demonstrates that the merchandise at issue is seaweed in its natural non-prepared state, except for drying and reduction in size. The air-drying procedure is solely to reduce the moisture content of the raw seaweed to increase its shelf-life. It does not prepare the seaweed to be suitable for human consumption. The drying process does not materially affect or change the seaweed's fundamentally raw, natural state. The seaweed has demonstrably not been roasted before it is imported. The subject merchandise was appropriately

labeled as dried seaweed, and indeed could not have been labeled, marketed, or sold as roasted seaweed.

12. Takaokaya USA then imports the Subject Merchandise and further processes it in its electric roasting line at approximately 220-degrees Celsius for seven seconds. The seaweed sheets are directly subject to a machine heating element, which cooks (i.e., roasts) the imported raw, dried seaweed, thus materially changing the product. The resulting prepared food is *roasted* seaweed, wholly distinct from the raw, dried seaweed Takaokaya USA imports.

13. Nori turns bright green when roasted because the darker pigments in the seaweed are more sensitive to heat than the green pigment and they break down, reducing their content. The following is an image of two seaweed sheets placed side-by-side. The one on the left has merely been dried in Japan before being shipped to the U.S., and the one on the right has been thereafter roasted in Takaokaya USA's Los Angeles factory.



## THE PROTESTED CLASSIFICATION

14. The Subject Merchandise was therefore entered under subheading 1212.21.00 of the HTSUS, as "seaweeds and other algae … frozen or dried, whether or not ground … used primarily for human consumption," which carries a 0% customs duty.

15. Customs, however, re-classified the merchandise under 2008.99.9190, HTSUS, as "fruit, nuts and other edible parts of plants, otherwise prepared or preserved … not elsewhere specified," which carries a 6% customs duty.

16. For the past 37 years, Takaokaya USA has consistently and routinely imported raw, dried Nori seaweed from Japan under 1212.21.00, HTSUS. The Japan Parent Company has been in the business of exporting dried Nori seaweed for decades to ports around the world. These products have in every case -- with the exception of the entries at issue here -- been classified under the harmonized tariff schedule as raw, dried seaweed and not as roasted seaweed.

17. The Japan Parent Company has obtained an Advance Classification Ruling from Japan's Customs and Tariffs Bureau that classifies the raw, dried Nori seaweed under 1212.21.00 HTSUS. A true and correct copy of the Advanced Classification Ruling is attached hereto as **Exhibit "B1"** with an English translation attached as **Exhibit "B2".**

18. Takaokaya USA, therefore, claims that the only correct classification is HTSUS subheading 1212.21.00 and filed its Protest on May 29, 2024.

19. Customs denied the protest on June 5, 2024.

20. Customs' stated reason for the denial was "[d]ue to the secondary drying process resulting in additional moisture content removal down to only 4% moisture remaining, the

subject seaweed has been further processed and therefore, properly classified in subheading 2008.99.9190."

21. Nothing in the subheading 1212.21.00, however, is limited to "seaweeds and other algae" with a remaining moisture content of over 4%.

22. Tariff classification is governed by the principles set forth in the General Rules of Interpretation ("GRIs") and, in the absence of special language or context which requires otherwise, by the Additional U.S. Rules of Interpretation ("Additional Rules"). The GRIs and Additional Rules are part of the HTSUS and are considered statutory provisions of law for all purposes.

23. GRI 1 provides that the classification of goods shall be determined according to the terms of the heading of the tariff schedule and any relative section or chapter notes. Merchandise classified under 1212, HTSUS includes "seaweeds and other algae … frozen or dried, whether or not ground … used primarily for human consumption." The relevant Explanatory Notes provide that heading 1212 "covers all seaweeds and other algae, whether or not edible. They may be fresh, chilled, frozen, *dried*, or ground." (emphasis added). Thus, the classification is broad and specifically identifies *dried* seaweed and algae used for various purposes including human consumption.

24. Court rulings have confirmed that naturally dried seaweed with no added ingredients is properly classified as edible seaweed and not as a prepared food. (See, e.g., *U.S. vs. Furuya & Co.* (W.D. Wash. 1910) 176 F. 480.)

25. Therefore, Customs has found that subheading 1212.21.00, HTSUS applies to seaweed "primarily in its natural, that is, non-prepared state, except for drying or reduction in size." (See HQ 950002, dated November 13, 1991.) Customs has consistently found that dried

seaweed that has not undergone "the cooking process of roasting" is classifiable under heading 1212, HTSUS. (See HQ H312097, dated June 14, 2021.)

26. On the other hand, certain preparations of seaweed – such as *roasting* – are not covered by the text of the provision and are excluded from heading 1212. For example, in HQ 088315, dated April 30, 1991, seaweed that had been cut, made into a paste, flattened to a sheet, dried naturally and then roasted, was properly re-classified under 2008, HTSUS.

PRIOR PRECEDENT REGARDING CLASSIFICATION OF SEAWEED

27. There is a significant amount of precedent distinguishing between raw, dried seaweed, subject to 1212, HTSUS, and roasted seaweed, subject to 2008, HTSUS. Most recently, in HQ H312097, dated June 14, 2021, Customs summarized this precedent and found that rulings differentiating between these two types of seaweed products focused on three crucial elements of production: (i) the temperature at which the seaweed is processed, (ii) the moisture content of the seaweed after it is processed, and (iii) the production processes by which the moisture content of raw seaweed is removed.

28. For example, in New York Ruling Letter 810717, dated June 5, 1995, Customs determined that seaweed processed in an electric drying machine operating at a temperature of 70 degrees Celsius to remove the moisture from the seaweed was properly classified under heading 1212, HTSUS. In contrast, seaweed that was first dried in the same kind of electric drying machine but then further processed by roasting it in a toasting machine at a temperature of 80 degrees Celsius was classified under heading 2008, HTSUS.

29. The Subject Merchandise at issue in this case has only been processed in an electric drying machine at approximately 70 degrees Celsius, and it has <u>not</u> been further processed in any kind of toasting or roasting machine.

30. In another example, in HQ H272093, where laboratory results could not determine whether the seaweed had been dried or roasted, Customs relied on the manufacturer's production process in finding the seaweed had not undergone any kind of roasting process. In that case the protestant's flow chart demonstrated as a matter of fact that the seaweed had merely been line dried and had not undergone any kind of a roasting process. Accordingly, Customs found the products in that case to be property classified under 1212, HTSUS.

31. Similarly, as shown in its production flowchart submitted herewith, the Japanese Parent Company's production process demonstrates that the seaweed products are merely dried in electric drying rooms, solely to extend the shelf life of the products, and were never subject to any kind of roasting process.

32. In one of the most recent cases, in HQ H295133, dated April 29, 2020, Customs found the seaweed at issue in that case had undergone two distinct industrial heating processes. First, the seaweed was subject to an industrial air-dryer, resulting in a moisture content of less than 6 %. Then, the seaweed was placed in an infrared ceramic oven and further processed, resulting in a moisture content of approximately 2.5%.  Although Customs found in that case that "the moisture level of the seaweed at issue is too low to be considered 'dried' for tariff classification purposes," it came to this conclusion only after consideration of the manufacturer's entire production process.  Customs did not rely solely on the moisture content to make its determination. Customs noted that the manufacturer's preliminary drying stage had already reduced the moisture content of the seaweed to less than 6 %. In effect, Customs determined that the secondary infrared ceramic heating was, in fact, a roasting process. Customs' conclusion in that case was further supported by health certificates submitted as part of the entry documentation that referred to the merchandise at issue as "roasted seaweed." Customs thus

found in that case the seaweed was classifiable under subheading 2008, HTSUS based on the totality of this evidence regarding the manufacturer's entire production process and not just a test of moisture content.

33.     The Subject Merchandise is distinct from the protestant's seaweed in HQ H295133. In that case, the seaweed was found to be air-dried and then subject to further processing in an infrared ceramic oven. That type of oven, which subjects the seaweed directly to a heating element, can reasonably be called the "cooking process of roasting." The merchandise in this case, on the other hand, has only been subject to one kind of heat process: air-drying. The seaweed here was never directly exposed to a heating element that could reasonably be called the "cooking process of roasting." Furthermore, the moisture content of the Subject Merchandise is, in any event, higher than the seaweed at issue in HQ H295133. Finally, unlike the seaweed in HQ H295133, the merchandise in this case was always appropriately labeled as dried seaweed, and indeed could not have been labeled, marketed, or sold as roasted seaweed.

34.     Most recently, in HQ H312097, dated June 14, 2021, after reviewing the foregoing precedent, CBP again focused on the production process of the merchandise in finding the calcified seaweed powders at issue in that case were properly classified under 1212, HTSUS. In that case, the protestant's production process included harvesting, preliminary washing/screening, heating and drying in an industrial drying machine, milling, sieving, and bagging. It found the powders merely consisted of dried seaweed that had undergone a type of industrial drying that did not materially impact the ultimate product, except to extend shelf life and reduce size. Crucially, instead of singularly focusing on the moisture content of the products, CBP rightly found the production process "did not result in the cooking process of roasting of the

9

imported products" and determined the products were "fundamentally akin to dried seaweed, which has solely been reduced in size into the form of the powder."

35.     The Subject Merchandise, although not reduced to a powder, is similar to the products in HQ H312097 since it is simply and fundamentally *dried* (and not cooked or roasted) seaweed.

PROPER CLASSIFICATION OF THE SUBJECT MERCHANDISE

UNDER 1212.21.00 HTSUS

36.     As to the merchandise at issue in this case, even though it had a moisture content below five percent, its production process distinguishes it from roasted seaweed CBP has found classifiable under subheading 2008, HTSUS. The Subject Merchandise has not undergone the cooking process of roasting. There was no material change to the seaweed from harvesting to import, except for drying and reduction in size. That is because Takaokaya USA imports this merchandise for the specific purpose of processing the raw, dried seaweed by roasting it after it is imported, and none of it is imported into broader markets in the U.S.A. until after it is processed at Takaokaya USA's factory

37.     The seaweed at issue only undergoes a process in Japan to remove excess water that cannot be said to constitute roasting. After the seaweed is harvested, rinsed, and cut into sheets, it is passed through an automated machine where it is sponge-pressed and hung in a drying room for approximately ninety minutes at 50-degrees Celsius. This reduces the moisture content to approximately 12 to 13 percent. The seaweed at this point is not shelf-stable and contains too much moisture to be roasted.

38.     The seaweed sheets are then folded and stacked vertically into an electric cabinet-style air-dryer. The air temperature in the cabinet is raised to 70 degrees Celsius and the seaweed

is dried for approximately three hours. This process reduces the moisture content to approximately 4 %, which extends its shelf life and allows for room temperature shipment. No ingredients are added to the seaweed and no additional processing occurs, except for bagging and boxing for shipment.

39.    It is important to emphasize that it is actually impossible to roast seaweed in the cabinet-style air-dryer employed by the Japanese Parent in this case. The air-dryer is fundamentally different from a toaster or roasting oven, such as the infrared ceramic oven utilized by the manufacturer in HQ H295133. In this industry, infrared ceramic heaters are used to deliver direct heat to flattened sheets of seaweed that are individually passed in a line under the heating element. That is the type of roasting process that Takaokaya USA utilizes at its Los Angeles facility to further process the seaweed at issue in this case after it is imported.

40.    For clarification purposes, the following is an image of the industrial machine used to sponge-press and air-dry the seaweed:



41.    The following is an image of the referenced electric cabinet-style air-dryer, where the seaweed is merely dehydrated in warm air and in fact cannot be roasted:



42.     To contrast the air-drying processes the seaweed undergoes in this case in the previous two images, the following is an image of a line-roasting machine used to process each seaweed sheet directly under a heating element to cook (i.e., roast or toast) the seaweed at 220-degrees Celsius. (This is the type of infrared ceramic oven referenced in HQ H295133 and utilized by the manufacturer in that case):



12

43.     In sum, the processes the merchandise at issue undergoes in Japan (before it is imported to the U.S.) do not involve "roasting" or cooking of any kind and do not materially change the harvested raw seaweed, except for drying and reduction in size. Only the actual roasting (and seasoning) of the seaweed materially changes the product, which transforms the seaweed into a prepared food suitable for use in the sushi industry and other food markets. In this case, that roasting process to prepare the raw, dried seaweed for human consumption at 220-degrees Celsius occurs only once the merchandise has been imported into the U.S.A. at Takaokaya USA's factory in Vernon, CA.  None of the Subject Merchandise enters the broader market in the U.S.A. until after Takaokaya USA roasts and further processes the seaweed at its factory.  Since the Denial of Takaokaya USA's Protest, Takaokaya is still roasting the Subject Merchandise at its factory in Vernon because it is the essential procedure necessary to prepare roasted seaweed regardless of the reclassification of the merchandise from 1212 to 2008.

WHEREFORE, plaintiff demands judgment ordering the appropriate Customs official or officials to: a) reliquidate the entries which are the subject of this action; b) classify the subject merchandise in HTS subheading 1212.21.00; c) refund all excess duties with interest as provided by law; and, d) provide such additional relief as the Court deems appropriate.

Respectfully submitted,

Attorneys for Plaintiff

By: _____

Glen Allen
Glen Allen Law
5423 Springlake Way
Baltimore, MD 21212

William D. Johnson
Johnson & Associates
350 S Figueroa St, Suite 190
Los Angeles, CA 90071

November 27, 2024